**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **PAY AS YOU GO, LLC,**<br>Plaintiff,<br>v.<br>**RINGCENTRAL, INC.,**<br>Defendant. | C.A. No. 3:26-cv-3849<br>**JURY TRIAL DEMANDED**<br>**PATENT CASE** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Pay As You Go, LLC, files this Complaint for Patent Infringement against RingCentral, Inc., and would respectfully show the Court as follows:

## I. THE PARTIES

1. Plaintiff Pay As You Go, LLC ("PAYG" or "Plaintiff") is a Wyoming limited liability company having an address at 1712 Pioneer Ave Suite 500, Cheyenne, Wyoming 82001.

2. On information and belief, Defendant RingCentral, Inc. ("RingCentral" or "Defendant") is a Delaware corporation with a regular and established place of business at 14675 Dallas Pkwy, Suite 200, Dallas, Texas 75254. Defendant has a registered agent at C T Corporation System, 1999 Bryant Street, Ste. 900, Dallas, Texas 75201.

## II. JURISDICTION AND VENUE

3. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4. On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its

business in this forum, including at least a portion of the infringements alleged herein at 14675 Dallas Pkwy, Suite 200, Dallas, Texas 75254.

5. Without limitation, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas. Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods and services provided to persons or entities in Texas. Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its sale of products and/or services within Texas. Defendant has committed such purposeful acts and/or transactions in Texas such that it reasonably should know and expect that it could be sued in this Court as a consequence of such activity.

6. Venue is proper in this District under 28 U.S.C. § 1400(b). On information and belief, Defendant has a regular and established place of business in Texas and in this District at 14675 Dallas Pkwy, Suite 200, Dallas, Texas 75254. On information and belief, from and within this District, Defendant has committed acts of infringement, including at least a portion of the infringements at issue in this case.

7. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

## III. THE PATENT-IN-SUIT

8. Plaintiff incorporates the above paragraphs herein by reference.

9. On March 14, 2006, United States Patent No. 7,013,127 ("the '127 Patent") was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '127 Patent is attached hereto as Exhibit A and incorporated herein by reference.

10. PAYG is the assignee of all right, title, and interest in the '127 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant

times against infringers of the ‘127 Patent. Accordingly, PAYG possesses the exclusive right and standing to prosecute the present action for infringement of the ‘127 Patent by Defendant.

**Background of the Invention**

11. The ’127 Patent relates to telecommunications services and methods that enable a user and/or other responsible party to make payments as the user uses the telecommunication services.

12. As described in the specification of the ‘127 Patent, before the invention claimed in the ‘127 Patent, it was known in the art of telecommunication services to provide calling card accounts to customers. A customer would receive account information in the form of a personal identification number (“PIN”) and a toll-free access number that allowed the customer to utilize the account. Those accounts were generally one of two types: (1) a pre-paid account, which was an account with a pre-defined amount of usage paid for in advance by the customer; and (2) a usage-based account, which was an account that is billed on a periodic billing cycle according to usage during the billing period. Pre-paid wireless (cell phone) service was one example of a pre-paid account.

13. Prior to the ‘127 Patent, pre-paid wireless service enabled customers to use the convenience of cellular and digital communications by establishing a pre-paid account with a wireless telecommunication vendor. Typically, pre-paid wireless cards, each card corresponding to a wireless services account, were purchased in preset denominations, such as $20, $50 or $100, often from a limited number of locations. Each card provided the user with a specified amount of wireless calling dollars or minutes. After the initial allocation was exhausted, the user could “recharge” or reload their wireless account, usually by calling a toll-free number, and either talking

with a customer service representative or using an automated system to charge additional calling dollars or minutes to a credit card.

14. There were many inventions directed to these types of systems and methods. For example, U.S. Pat. No. 6,185,545 discloses a method for effecting payment of goods or services that establishes an intermediary account associated with the user account to permit the user to pre-pay for telecommunications services. Another patent, U.S. Patent No. 6,282,276, discloses value-added service calls that traditionally have been "800" or "900" number calls. U.S. Patent No. 6,397,055 discloses a system and method for charting a pre-paid wireless call user. U.S. Patent No. 6,424,706 discloses a system and method for accessing the value associated with a pre-purchased amount of telecommunication time. WO 01/82582 discloses communication billing systems that provides interrelated processing of wireless service events and wire line service events. WO 02/11422 discloses a communication account system for dynamically providing communication accounts to communication devices for immediate transfer to users, including a means for determining an amount of prepaid time for communication.

15. These prior art pre-paid systems were burdensome to both the user and the telecommunication service provider. Moreover, these prior art pre-paid systems generally required that the user have a current credit card with an available balance, which created a significant burden in and of itself to certain classes of user, such as individuals who lacked sufficient regular income, individuals with too much existing debt, individuals with poor credit histories, and individuals who lacked and/or were unable to obtain a social security number.

**The Patented Invention**

16. The '127 Patent discloses specific improved methods for effecting payment for pay-as-you-go telecommunication services via a third-party. The claimed method comprises:

monitoring a user's use of telecommunication services at regular time intervals; communicating results of the monitoring to the provider of the telecommunication services, who then processes the results and communicates those to the user; and receiving a payment from the user, wherein: (i) the payment is received from the user at a third-party point-of-sale together with an account identifier, (ii) data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider from the third party; and (iii) an amount of money equal to the payment is received by the telecommunications services provider from the third-party. The point-of-sale can be a physical location, such as a retail merchant site; a vending machine; and an automated teller machine, or a virtual location, such as a website or application. The payment at the point-of-sale can be made in any acceptable form, including cash, a wire-transfer or bank-transfer, a debit card transaction, and a credit card transaction.

17. The methods of the claimed invention are an improvement over conventional methods that allow a user to pay as the telecommunication services are being used (*i.e.*, "pay-as-you-go"). Various embodiments of pay-as-you-go methods are illustrated in FIG. 1 and FIG. 2 of the '127 Patent.

18. Unlike standard mobile phone calling plans that charged a set monthly fee for a specific amount of calls or usage, pay-as-you-go plans only required the user to purchase minutes or usage when they would like to make a call or use the telecommunication services. This was a significant advantage to consumer-users who did not want to be bound by an annual, or even biannual, contract, as well as to consumer-users who did not possess sufficient credit (or credit-worthiness) to qualify for such a contract. This latter group included not only individuals with bad credit ratings, but also hourly-wage earners, individuals under the age of 18, and individuals unable to obtain a social security number.

19. Pay-as-you-go calling plans also represented an advance to consumer-users who, for whatever reason, wanted to preserve their privacy and so were reluctant to enter into a contract with a telecommunications service provider that would require the disclosure of confidential personal information, like the consumer-user's name, home address, social security number, and the like. In 2020, there were approximately 74 million pay-as-you-go consumer-users in the United States.

20. Pay-as-you-go systems also provide an advantage for telecommunication service providers. With pay-as-you-go systems, use of the telecommunication services can be suspended by the telecommunication services provider upon the available balance in a user's account being fully consumed. And, because use is monitored at regular time intervals, such a suspension can generally be achieved before the user and/or the responsible party accumulates any balance due.

21. However, a significant drawback of prior art pay-as-you-go systems and methods was the inability to add extra time or services after the initial purchase of the phone and time without a credit or debit card. Because of this, many prior art pay-as-you-go systems and methods were almost as bad as standard mobile phone calling plans for individuals with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers. Such systems and methods were also less-than-desirable for individuals who wished to protect their private, personal confidential information and/or preserve their anonymity through cash-only transactions or the like. For all of those different groups of individuals, prior to the invention of the methods claimed in the '127 Patent, the only solution to the problem of running out of time was to purchase another pre-paid phone altogether—a "solution" which could end up being prohibitively expensive in the long term.

22. Unlike prior art pay-as-you-go systems and methods which required direct payment from a user to the telecommunications service provider via a credit or debit card to add time or data for further use, the methods of the invention claimed in the ‘127 Patent permit a user to make payments via a third-party point-of-sale site. Such a third-party point-of-sale site may be a physical location, such as a gas station or convenience store equipped with an electronic point-of-sale device, or a virtual location, such as a website or app like PayPal® or Venmo®. While such payments can be made electronically, *e.g.*, via credit card, debit card, check card or any other such means, including on-line banking, they do not have to be made electronically like the prior art systems required. Rather, payments according to the invention claimed in the ‘127 Patent can also be made in cash, *i.e.*, the user can make a payment with cash at a designated location, and the amount paid at the designated location will be credited to the user's account to cover the services rendered in step 68 of FIG. 2.

23. To use a designated location 12 to make payment, a user 10 may be issued an account identifier 14, *e.g.*, an individual account number, in step 62 of FIG. 2, that uniquely identifies that user 10. Such an account identifier 14 enables a user 10 to make a payment at the designated location in step 64 of FIG. 2. As noted above, this may be done, *e.g.*, via a point-of-sale terminal 16, where a user’s credit card or debit card is “swiped” both to identify the user 10 and to collect payment of a specified amount, or where a user physically inserts cash in the form of paper bills and/or metal coins and enters his/her account identifier via a pin pad or the like. The payment information is then relayed to the telecommunication services provider 18 in step 66 of FIG. 2. The designated location 12 can be any physical or virtual location that processes a credit or debit card and/or can accept cash, *e.g.*, retail stores such as a dry cleaner, a drug store, a supermarket, or a convenience store, etc., and websites and mobile applications like PayPal®.

24. The inventions claimed in the ’127 Patent include methods that enable a user of pay-as-you-go telecommunication services to make payments for those telecommunications services via a third-party point-of-sale.

25. Prior to the invention claimed in the ‘127 Patent, users of telecommunications services that did not have a credit card, debit card, and/or linkable bank account were generally unable to use “pay as you go” systems. This requirement presented a problem to users with bad credit ratings, hourly-wage earners, and individuals under the age of 18, as well as individuals who wished to protect their privacy and/or preserve their anonymity.

26. The methods claimed in the ‘127 Patent are directed to novel ways of permitting users of telecommunications services to purchase those services on an as-needed basis without needing a credit card, debit card or linkable bank account, and without having to disclose personal identifying information. This represents a significant advantage to users with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers, as well as individuals who wished to preserve their anonymity.

27. Claim 1 also provides a specific technical solution for integrating disparate systems, including telecommunication usage monitoring systems, telecommunication billing systems, and retail point-of-sale systems into a unified payment framework. For example, the limitation “monitoring a user's use of the telecommunication services at regular time intervals” is a technical element that involved not merely collection information but implements a specific technical monitoring mechanism that executes operations at defined intervals, which differs from traditional post-paid billing cycles. This real-time processing capability requires technical infrastructure to capture, process, and communicate usage data at predetermined intervals rather than relying on traditional monthly billing cycles. This represents a technical advancement because it enables

immediate awareness of usage patterns and allows for responsive system actions based on current usage data. The specification of US 7,013,127, in column 4, lines 44-49, describes this as enabling the telecommunication services provider to produce "the equivalent of an updated invoice" immediately upon completion of service use. The technical implementation requires the system to maintain a running tally of usage that is updated every monitoring interval, implement algorithms to aggregate these frequent data points into billable amounts, and provide instant access to this information when the user ends their session. This transformation from reactive billing systems to proactive usage management represents a technical solution to the problem of efficiently allocating resources and notifying users in telecommunication services. Regular interval monitoring establishes a technical framework that maintains ongoing awareness of system utilization, enabling both service providers and users to make informed decisions based on current usage data rather than historical data.

28. The limitation "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" is a technical limitation requiring a specific technical data flow and processing architecture, which is not a generic communication concept. The claimed invention implements a communication framework for relaying usage information and payment status. As described in the specification of US 7,013,127, in column 4, lines 52-57, "[t]he telecommunication services provider 18 then relays this information in step 78 of FIG. 2 back to the user 10 via e-mail 30, via interactive web access 40, via SMS 42, via MMS 44, and/or via a voice and/or a data call 46…." (Ex. A at 4:51-55). This multi-channel approach represents a technical solution because it implements multiple communication pathways to ensure users receive timely information about their usage and account status. The system can notify users through

various technical means, adapting to user preferences and device capabilities. The specification describes that this includes notification “if the user 10 is at a pre-designated limit,” demonstrating proactive account management. (Ex. A at 4:55-57). This limitation defines a specific technical protocol for data exchange. This is not generic communication but a defined technical flow: usage data → provider → processing → user notification.

29. The limitation “receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier” is another technical limitation requiring a specific technical implementation that utilizes account identifiers in point-of-sale systems, rather than any particular payment method. The limitation “data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider” is another technical limitation requiring a specific three-part technical reconciliation system, which is not a simple payment transfer. This limitation requires a specific technical reconciliation mechanism that tracks and settles payments across multiple parties. Claim 1 of the ‘127 Patent therefore solves a technical problem by creating an integrated architecture or integrated system that enables real-time monitoring, immediate billing, and distributed payment processing through retail infrastructure.

30. The claimed invention also implements integration at the network level between telecommunication services networks and payment processing systems. As shown in Fig. 1 of the ‘127 Patent, the claimed invention requires technical connections between the telecommunication services network 24, the telecommunication services provider 18, point-of-sale terminals 16, and various communication channels. Figure 1 and the accompanying description in the specification

of the ‘127 Patent demonstrate that the telecommunication services network 24 is technically coupled with the telecommunication services provider 18 through data communication pathways that enable transmission of call detail records (CDRs) and usage monitoring data. The point-of-sale terminals (16) are integrated into this architecture through the establishment of secure communication channels that permit the transmission of payment transaction data, including account identifiers and payment amounts, to the telecommunication services provider (18). This network-level integration enables real-time data flow between disparate systems, creating a unified technical framework for service monitoring, billing, and payment processing.

31. The technical framework achieves unification through the implementation of a centralized data processing architecture at a telecommunication services provider, which serves as the integration hub for disparate data streams. The network-level integration is evidenced by the invention’s ability to correlate usage data from the telecommunication services network with payment data from point-of-sale terminals, enabling immediate account updates and service adjustments. The data flow capability is achieved through event-driven architectures where state changes in one system component trigger notifications and updates in connected systems. Traditional telecommunication billing systems operated with temporal delays between service usage, billing calculation, and payment processing, with each function residing in isolated systems that exchanged data through batch processes. The invention coordinates multiple technical systems, including telecommunication networks, point-of-sale systems, communication platforms (such as email, SMS, MMS, and voice), and interactive voice and data systems. This coordination creates a comprehensive technical ecosystem for pay-as-you-go telecommunication services.

32. Claim 1 of the ‘127 Patent cannot be performed with mental processing, along with pen and paper. The step of “monitoring a user's use of the telecommunication services at regular

time intervals" cannot be manually performed as it necessitates a technical integration within a telecommunication network. Nor can "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" be performed manually because it also requires a technical integration within a telecommunication network and the ability to process results from such electronic monitoring.

33. The claims of the '127 Patent are therefore not directed to an abstract idea or law of nature.

34. The claims of the '127 Patent provide solutions to specific and persistent problems that existed with conventional pay-as-you-go systems and methods, including how could certain users (such as individuals with bad or no credit, hourly-wage earners, individuals under the age of 18, individuals without a social security number, and individuals who wished to maintain their privacy) continue to use a prepaid phone or similar device once the original time had expired and/or been consumed. The inventions claimed in the '127 Patent provide a real-world solution to that real-world problem.

35. The invention described in the claims of the '127 Patent enables users to add to a pre-paid phone or similar device after the initial purchase thereof without using a credit or debit card or bank account and without needing to reveal personal confidential information, such as an individual's name or social security number. The patented invention does this by enabling such users to provide payment to the telecommunications service provider through a third-party willing to accept forms of payment other than a credit or debit card, including virtual sites, like PayPal®, and brick-and-mortar businesses, like convenience stores and gas stations.

36. The claimed invention also has several inventive concepts.

37. The claimed invention is distinguishable from claims that merely recite generic steps of "receiving," "authenticating," and enabling transactions without specifying how these functions are performed. Claim 1 of the '127 patent specifies how monitoring occurs (*e.g.*, at regular time intervals), how communication flows (*e.g.*, specific bi-directional paths with processing; usage data → provider → processing → user notification), how payment is integrated (*e.g.*, through point-of-sale transactions using account identifiers), and how reconciliation occurs (*e.g.*, three-part settlement system, involving a telecommunication services provider, a point-of-sale proprietor, and a user). It was not routine, well-known, or conventional to use any of these limitations at the priority date of the '127 Patent.

38. The use of "a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider" represents an unconventional technical solution because it creates a new payment pathway that leverages existing retail infrastructure for telecommunication services. For example, "[t]he designated location 12 can be any location that processes a credit card, e.g., retail stores such as the dry cleaners, the drug store, the supermarket, etc." (Ex. A at 4:34-37). The technical implementation requires coordination between disparate systems, including retail point-of-sale terminals and telecommunication billing systems, to create a unified payment ecosystem. This goes beyond traditional payment methods by enabling cash payments through a distributed network of retail locations.

39. The independent Claim 1 further recites that "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider." This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical

implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

40. Claim 1 also recites ”a payment is received from the user at a point-of-sale together with an account identifier,” necessitates the implementation of a technical interface at the point of sale. The point-of-sale terminal must be configured to accept the account identifier associated with telecommunication services. The terminal must be programmed to process payments designated for telecommunication accounts rather than retail purchases. The system must implement data capture mechanisms that associate the payment amount with the specific account identifier.

41. Claim 1 further recites that “data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider.” This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

42. Claim 1 also recites “an amount of money equal to the payment amount is received from a point-of-sale proprietor by the telecommunication services provider,” which establishes a unique payment architecture for telecommunication systems. This architecture involves three distinct parties in each transaction. The user provides payment at the retail location. The point-of-sale proprietor collects and temporarily holds these funds. The telecommunication services provider ultimately receives the payment from the proprietor. This three-part system necessitates the implementation of sophisticated tracking and reconciliation mechanisms. The system must

maintain transaction records that link each user's payment to the corresponding account identifier. The technical implementation requires the establishment of a trusted intermediary relationship. The point-of-sale proprietor effectively becomes a payment agent for the telecommunication services provider. This relationship requires technical mechanisms for transaction verification and dispute resolution.

43. The ordered combination of the claim limitations was also not routine, well-known, or conventional at the priority date of the ‘127 Patent. The claimed invention’s interval-based monitoring represents an unconventional technical solution to the problem of real-time billing and account management. As described in the specification of ‘127 Patent, the system monitors usage “at regular time intervals... e.g., at 5-, 10-, 15- or 30-minute intervals.” (Ex. A at 4:40-44). This granular monitoring enables immediate billing calculations and account management decisions. Similarly, the technical advancement is further described in the ’127 Patent, which describes how “Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated.” (Ex. A at 2:26-32). The invention’s ability to monitor and process usage data at regular intervals enables dynamic account management, including the automated suspension and reactivation of accounts based on payment status. This creates a technical framework that prevents debt accumulation while maximizing service availability.

44. The technical implementation differs from traditional billing architectures. Traditional systems employ batch processing models with monthly data aggregation. The claimed system implements stream processing with continuous data flow. As explained in the ‘127 Patent, “Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated.” (Ex. A at 2:26-

32). This capability requires the system to maintain real-time usage accumulators. The invention implements calculation engines that process accumulated interval data upon session termination. The invention must also provide data access interfaces for user queries.

45. The comprehensive data flow system described in Claim 1 creates an interconnected network of information exchange that enables sophisticated management of telecommunication services. The process begins with the monitoring component, which tracks a user's telecommunication usage at regular time intervals. As described in the ‘127 Patent, this monitoring generates detailed usage data that captures when services are used, for how long, and what types of services are consumed. (Ex. A at 4, lines 40-57). This raw monitoring data then flows to the telecommunication services provider through established communication channels. The telecommunication services provider acts as the central processing hub in this ecosystem. When the provider receives the monitoring results, it processes this information to create meaningful data for the user. As disclosed in the ‘127 Patent, the provider produces “the equivalent of an updated invoice” from the call detail records received from the telecommunications services network. (Ex. A at 4:46-49). This processing involves calculating charges, applying rate plans, and preparing comprehensive account status information. The provider can then communicates these processed results back to the user through one of multiple available channels. (*Id.* at 4:51-57).

46. The claims of the ‘127 patent recite a particular way of effecting such payments via a third-party point of sale site, which are not generic and do not preempt alternate methods of payment. Alternative ways exist and are known for a user to affect payment for pay-as-you-go telecommunications services, including the prior art method of submitting a credit or debit card directly to the provider of the telecommunications services.

## IV. COUNT I
## (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,013,127)

47. **Direct Infringement.** Upon information and belief, Defendant directly infringed claim 1 of the '127 Patent in Texas, this District. and elsewhere in the United States. As shown below, Defendant performed steps of a pay-as-you-go method for affecting payment of telecommunication services with its usage-based pricing (Pay-per-Usage) plan that satisfied each limitation of claim 1 of the '127 Patent. RingCentral provides the RingEX monetization platform, which is an all-in-one solution that enables merchants to offer and sell their services (*e.g.*, software, telecommunication services, PDF access, etc.) on a subscription, usage-based, or pay-as-you-go model. All steps of the asserted claim were performed using the RingEX monetization platform.

48. Defendant performed a method for affecting payment of telecommunication services. For example, RingCentral provides RingEX, a cloud-based business communications platform that provides voice, messaging, and video services ("telecommunication services") to enterprises. Through RingEX, employees of organizations subscribed to the RingEX platform can place and receive calls and send SMS messages using the RingCentral desktop or mobile application running on their devices. In addition to subscription-based services, RingEX offers pay-as-you-go options for additional calling and messaging usage, for which charges are incurred based on the applicable subscription plan and any excess usage. Further, the RingEX Admin Portal enables organizations to review and pay bills ("payment of telecommunication services") associated with employees' use of the communication services, including any applicable add-on or overage charges.




(*E.g.*, https://www.ringcentral.com/ringex.html).[1]




(*E.g.*, https://www.ringcentral.com/office/plansandpricing.html).

[1] Red boxes and text added to figures unless otherwise noted.

## Types of SMS billing plans

There are three billing types for SMS plans:

- **Free allotments**: Your RingEX license type includes a specified amount of free SMS credits. Visit SMS and MMS pricing overview to learn about these allotments.
- **Prepaid SMS bundles**: You can purchase a bundle with monthly SMS credits. Visit Purchasing SMS usage bundles to learn more.
- **Additional Usage Credits**: Once you run out of free or prepaid SMS credits, you'll be billed on a pay-as-you-go (PAYG) basis for any additional SMS messages.

(*E.g.*, https://support.ringcentral.com/article-v2/SMS-billing-overview.html?brand=RingCentral&product=RingEX&language=en_US).

## How do I send SMS/MMS?

Users can send and receive SMS and MMS to and from non-RingCentral providers using the RingCentral app for desktop and web and RingCentral app for mobile. For more info, go to Sending and viewing text messages.

(*E.g.*, https://support.ringcentral.com/article-v2/RingCentral-Business-SMS-MMS-FAQ-partner.html?brand=Partner&product=RingEX&language=en_US).

## Is the RingCentral app free?

Yes. You can download the RingCentral mobile app on iOS and Android mobile devices and the RingCentral desktop app on Windows and Mac for free. You can create a free account with RingCentral Video Pro, then upgrade to paid plans like RingCentral Video Pro+ and RingEX at any time.

(*E.g.*, https://www.ringcentral.com/download.html#sms-invitation-country-not-found).

# Setting the Auto-Purchase amount for Calling Credits in the Admin Portal

As an admin, billing admin, or user with billing admin access, you can set your account's auto-purchase amount in the Admin Portal. **Auto-Purchase** ensures you will never run out of calling credits.

The selected package will be purchased automatically when you're running low on calling credits, preventing any potential service interruption. Purchased funds will roll over month-to-month for up to 12 months.

payment of telecommunication services

When you make an international call, your included plan credits are used first. If available, your international calling credits are used next, followed by any additional calling credits.

(*E.g.*, https://support.ringcentral.com/article-v2/9766.html?brand=RingCentral&product=RingEX&language=en_US).




(*E.g.*, https://support.ringcentral.com/article-v2/9766.html?brand=RingCentral&product=RingEX&language=en_US).




(*E.g.*, https://support.ringcentral.com/article-v2/Understanding-your-RingCentral-billing-account-overview-page.html?brand=RingCentral&product=RingEX&language=en_US).

49. Defendant performed the step of monitoring a user's use of the telecommunication services at regular time intervals. For example, when an employee ("user") of an organization registered with RingEX uses the platform to make calls or send messages using the RingCentral desktop or mobile application installed on their devices, the RingCentral application continuously collects communication data, including call records and SMS usage data ("monitoring a user's use of the telecommunication services"), for the registered employee, and stores this data in its application-specific local storage. The application also synchronizes communication data, such as call logs and SMS information, with RingCentral's cloud servers. Therefore, the monitoring is performed by the RingCentral application itself, which, like other Android or iOS applications, operates within an operating-system-enforced application sandbox and stores the collected usage data in its own private, application-specific local storage before transmitting the data to

RingCentral's servers. This is consistent with the general architecture of client-side communication and usage-tracking applications, which continue to collect and locally store usage data regardless of whether an active network connection to the server is available at that time, and subsequently transmit the accumulated data once connectivity is restored or during scheduled synchronization events. Further, the RingEX platform displays credit-based usage for international calling, SMS messaging, and any additional pay-as-you-go services via the organization's RingEX Admin Portal, and when RingEX determines that a user has exhausted the allotted prepaid messages, it automatically applies additional charges on a pay-as-you-go basis, which are incorporated into the bill during each billing cycle. Therefore, it would be apparent to a person having ordinary skill in the art that the RingCentral app continuously monitors employee devices to determine the usage of the communication services at a regular time interval, such that the RingEX platform computes the bill for the employee.

*Service Usage Data:*

- Device information (such as IP address, ISP, device and operating system type, operating system and client version, client version, type of microphone or speakers, and other related information)
- System logs, including usage logs, backend logs, client logs
- Internal feature usage analytics
- Cookie identifiers
- Traffic data about the communications that take place through our platform (such as chat, video conferencing) which include, network monitoring data, and call detail records produced by a telephone call or other telecommunications transactions. The call detail record contains various attributes of the call, such as time, duration, completion status, source number and destination number.
- Quality of Service data
- Fraud and threat analysis data
- Connection type and related information (e.g., connected over WiFi)

(*E.g.*, https://www.ringcentral.com/legal/last-update-august-29-2025/privacy-notice.html).

App activity
App interactions

Data collected and for what purpose

**App interactions**
Analytics

(*E.g.*, https://play.google.com/store/apps/datasafety?id=com.glip.mobile&hl=en_US).

**C. Enhanced Business SMS Allotment and Pricing.**

Each RingEX plan includes a number of SMS per each user, per month, which are pooled to create a single allotment of SMS available to the entire account. Core/Advanced/Ultra tier RingEX plans include a monthly allotment of 25/100/200 SMS, per user respectively. Each SMS sent or received will be deducted from the pool of available SMS on the account. Overage charges apply to SMS sent or receive in excess of allotment and will be charged at the then-applicable rates, available at https://ringcentral.com/support/new-sms-rates.html. Additional SMS bundles are available for purchase at discounted prices. Customer must successfully register phone numbers with the SMS registrar prior to using SMS. RingCentral may attempt to deliver SMS sent from unregistered phone numbers at its discretion, however unregistered SMS are excluded from the monthly allotment and any purchased SMS bundles, and will be charged at then-applicable unregistered SMS rates, available at https://ringcentral.com/support/new-sms-rates.html

user's use of the telecommunication services

(*E.g.*, https://www.ringcentral.com/legal/ringex-service-attachment.html).

## How do I send SMS/MMS?

Users can send and receive SMS and MMS to and from non-RingCentral providers using the RingCentral app for desktop and web and RingCentral app for mobile. For more info, go to Sending and viewing text messages.

(*E.g.*, https://support.ringcentral.com/article-v2/RingCentral-Business-SMS-MMS-FAQ-partner.html?brand=Partner&product=RingEX&language=en_US).

## Company contacts

Company contacts are co-workers whose email addresses are on your company's private domain. These users have full access to the app, with the exception of admin-specific features.

By default, co-workers can invite guest users. However, if you cannot invite other users, your admin may have disabled this permission on the account level. Please reach out to an account admin if you believe that you should have these permissions.

(*E.g.*, https://support.ringcentral.com/article-v2/Intro-to-users-in-the-RingCentral-app.html?brand=RingCentral&product=RingEX&language=en_US).

| | | | |
|---|---|---|---|
| Application presence status, call log notifications, and voicemail notifications - used in Android, not in iOS | HTTPS | ringcentral.pubnubapi.com<br>ringcentral-0.pubnubapi.com<br>ringcentral-1.pubnubapi.com<br>ringcentral-2.pubnubapi.com<br>ringcentral-3.pubnubapi.com<br>ringcentral-4.pubnubapi.com<br>ringcentral-5.pubnubapi.com<br>ringcentral-6.pubnubapi.com<br>ringcentral-7.pubnubapi.com<br>ringcentral-8.pubnubapi.com<br>ringcentral-9.pubnubapi.com | TCP\443 |
| Data synchronization with cloud (e.g., call log info, presence, and voicemails) | HTTPS | api-mob.ringcentral.com | TCP\443 |
| Soft clients software and provisioning updates | HTTPS | *.cloudfront.net | TCP\443 |

(*E.g.*, https://support.ringcentral.com/article-v2/Network-requirements-partner.html?brand=Partner&product=RingEX&language=en_US).

## Types of SMS billing plans

There are three billing types for SMS plans:

- **Free allotments**: Your RingEX license type includes a specified amount of free SMS credits. Visit SMS and MMS pricing overview to learn about these allotments.
- **Prepaid SMS bundles**: You can purchase a bundle with monthly SMS credits. Visit Purchasing SMS usage bundles to learn more.
- **Additional Usage Credits**: Once you run out of free or prepaid SMS credits, you'll be billed on a pay-as-you-go (PAYG) basis for any additional SMS messages.

(*E.g.*, https://support.ringcentral.com/article-v2/SMS-billing-overview.html?brand=RingCentral&product=RingEX&language=en_US).

## Setting the Auto-Purchase amount for Calling Credits in the Admin Portal

As an admin, billing admin, or user with billing admin access, you can set your account's auto-purchase amount in the Admin Portal. **Auto-Purchase** ensures you will never run out of calling credits.

The selected package will be purchased automatically when you're running low on calling credits, preventing any potential service interruption. Purchased funds will roll over month-to-month for up to 12 months.

regular time intervals

When you make an international call, your included plan credits are used first. If available, your international calling credits are used next, followed by any additional calling credits.

(*E.g.*, https://support.ringcentral.com/article-v2/9766.html?brand=RingCentral&product=RingEX&language=en_US).




(*E.g.*, https://support.ringcentral.com/article-v2/Managing-your-account-Usage-in-the-RingCentral-Admin-Portal.html?brand=RingCentral&product=RingEX&language=en_US).

Options may include:

- General Usage
  - Current Plan Usage
  - Included SMS Usage: Click **View Log** to see the usage history.
  - Mobile Users: Click **View History** to see statistics for the user's mobile usage.
- Credits
  - Calling Credits: If you don't see a bundle, click **Add Bundle** to purchase. Click **Change** to update your existing bundle. Click **Cancel** to remove the bundle. Cancellation is available only for customers without a contract.
  - International Calling Credits: If you don't see a bundle, click **Add Bundle** to purchase. Click **Change** to update your existing bundle. Click **Cancel** to remove the bundle. Cancellation is available only for customers without a contract.
  - SMS Bundle: If you don't see a bundle, click **Add Bundle** to purchase. Click **Change** to update your existing bundle. Click **Cancel** to remove the bundle. Cancellation is available only for customers without a contract.
  - Additional Usage Credits: Click **View Rates** to see credit cost details.
- Auto-Purchase: Set your account's auto-purchase amount.

(*E.g.*, https://support.ringcentral.com/article-v2/Managing-your-account-Usage-in-the-RingCentral-Admin-Portal.html?brand=RingCentral&product=RingEX&language=en_US).

# Application Sandbox

The Android platform takes advantage of the Linux user-based protection to identify and isolate app resources. This isolates apps from each other and protects apps and the system from malicious apps. To do this, Android assigns a unique user ID (UID) to each Android app and runs it in its own process.

Android uses the UID to set up a kernel-level Application Sandbox. The kernel enforces security between apps and the system at the process level through standard Linux facilities such as user and group IDs that are assigned to apps. By default, apps can't interact with each other and have limited access to the OS. If app A tries to do something malicious, such as read app B's data or dial the phone without permission, it's prevented from doing so because it doesn't have the appropriate default user privileges. The sandbox is simple, auditable, and based on decades-old UNIX-style user separation of processes and file permissions.

(*E.g.*, https://source.android.com/docs/security/app-sandbox).

# Data and file storage overview

Android uses a file system that's similar to disk-based file systems on other platforms. The system provides several options for you to save your app data:

- **App-specific storage:** Store files that are meant for your app's use only, either in dedicated directories within an internal storage volume or different dedicated directories within external storage. Use the directories within internal storage to save sensitive information that other apps shouldn't access.
- **Shared storage:** Store files that your app intends to share with other apps, including media, documents, and other files.
- **Preferences:** Store private, primitive data in key-value pairs.
- **Databases:** Store structured data in a private database using the Room persistence library.

(*E.g.*, https://developer.android.com/training/data-storage).




(*E.g.*, https://developer.apple.com/documentation/security/protecting-user-data-with-app-sandbox).

50. Defendant performed the step of communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user. For example, RingEX enables registered employees of an organization to place calls and send SMS messages through the RingCentral desktop or mobile application installed on their devices, and collects the corresponding usage data, including the number of calls made and messages sent by each employee. The RingCentral app installed on the registered employee's device synchronizes the data with RingCentral's server. Further, RingEX presents the aggregated service usage through the Admin Portal and the corresponding bill through the Billing Portal. Because employees are required to register and use the RingCentral application to access the RingEX communication services, it would be apparent to a person having ordinary skill in the art that the RingCentral

application monitors the communication activity occurring on the employee device and communicates the monitored usage information to the RingCentral's servers, enabling RingCentral server to process the data ("processes said results") and calculate charges based on the employees' consumption of the communication services and display ("communicates processed results to said user") it through the RingEX Admin Portal.

**C. Enhanced Business SMS Allotment and Pricing.**

Each RingEX plan includes a number of SMS per each user, per month, which are pooled to create a single allotment of SMS available to the entire account. Core/Advanced/Ultra tier RingEX plans include a monthly allotment of 25/100/200 SMS, per user respectively. Each SMS sent or received will be deducted from the pool of available SMS on the account. Overage charges apply to SMS sent or receive in excess of allotment and will be charged at the then-applicable rates, available at https://ringcentral.com/support/new-sms-rates.html. Additional SMS bundles are available for purchase at discounted prices. Customer must successfully register phone numbers with the SMS registrar prior to using SMS. RingCentral may attempt to deliver SMS sent from unregistered phone numbers at its discretion, however unregistered SMS are excluded from the monthly allotment and any purchased SMS bundles, and will be charged at then-applicable unregistered SMS rates, available at https://ringcentral.com/support/new-sms-rates.html

(*E.g.*, https://www.ringcentral.com/legal/ringex-service-attachment.html).

## How do I send SMS/MMS?

Users can send and receive SMS and MMS to and from non-RingCentral providers using the RingCentral app for desktop and web and RingCentral app for mobile. For more info, go to Sending and viewing text messages.

(*E.g.*, https://support.ringcentral.com/article-v2/RingCentral-Business-SMS-MMS-FAQ-partner.html?brand=Partner&product=RingEX&language=en_US).

*Service Usage Data:*

- Device information (such as IP address, ISP, device and operating system type, operating system and client version, client version, type of microphone or speakers, and other related information)
- System logs, including usage logs, backend logs, client logs
- Internal feature usage analytics
- Cookie identifiers
- Traffic data about the communications that take place through our platform (such as chat, video conferencing) which include, network monitoring data, and call detail records produced by a telephone call or other telecommunications transactions. The call detail record contains various attributes of the call, such as time, duration, completion status, source number and destination number.
- Quality of Service data
- Fraud and threat analysis data
- Connection type and related information (e.g., connected over WiFi)

(*E.g.*, https://www.ringcentral.com/legal/last-update-august-29-2025/privacy-notice.html).

| | | | |
|---|---|---|---|
| Application presence status, call log notifications, and voicemail notifications - used in Android, not in iOS | HTTPS | ringcentral.pubnubapi.com<br>ringcentral-0.pubnubapi.com<br>ringcentral-1.pubnubapi.com<br>ringcentral-2.pubnubapi.com<br>ringcentral-3.pubnubapi.com<br>ringcentral-4.pubnubapi.com<br>ringcentral-5.pubnubapi.com<br>ringcentral-6.pubnubapi.com<br>ringcentral-7.pubnubapi.com<br>ringcentral-8.pubnubapi.com<br>ringcentral-9.pubnubapi.com | TCP\443 |
| Data synchronization with cloud (e.g., call log info, presence, and voicemails) | HTTPS | api-mob.ringcentral.com | TCP\443 |
| Soft clients software and provisioning updates | HTTPS | *.cloudfront.net | TCP\443 |

(*E.g.*, https://support.ringcentral.com/article-v2/Network-requirements-partner.html?brand=Partner&product=RingEX&language=en_US).

The Users Report (previously called User Activity Report) summarizes inbound and outbound call volume and usage for selected users over a selected date range. This report compares call volume metrics with a user's job performance or workload to understand how to optimize the calls for best results. It can be accessed from the RingCentral Online account > Analytics > Performance Reports.

## How to Generate a Users Report

The **Users Report** is previously called the **User Activity Report** (from Historical Reports). This can be generated from the **Analytics Portal > Performance Reports** section.

**IMPORTANT:** All current Historical Report subscriptions will be automatically paused. In order to continue to receive reporting subscriptions, Users will need to enable subscriptions in the Analytics Portal.

1. Log in as the Account administrator to the RingCentral Online Account.

2. Go to **Admin Portal > Analytics > Performance Reports** .

3. Click the **Calendar** to set the date. You can select **preset time periods** or select **Custom Ranges** . Click **Done** to set.




(*E.g.*, https://support.ringcentral.com/article-v2/10723-Reports-Generate-User-Activity-Report.html?brand=RC_US&product=RingEX&language=en_US).




(*E.g.*, https://support.ringcentral.com/article-v2/Managing-your-account-Usage-in-the-RingCentral-Admin-Portal.html?brand=RingCentral&product=RingEX&language=en_US).

51. Defendant performed a step of receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider. For example, at the RingCentral Billing Portal, an administrator pays the displayed bill using a selected payment method, such as a credit card. Such payment methods involve the administrator completing a transaction through a web-based billing interface or payment gateway ("point-of-sale") that is accessible via the user's RingCentral account and includes billing account information, such as the associated email address and phone number ("account identifier"). Upon completion of the transaction, the payment interface and payment gateway generate payment details and transaction information ("data indicative of the payment transaction") and provide such information to RingCentral's billing systems ("telecommunication services provider"). Accordingly, upon information and belief, payment for the communication services is received by RingCentral's servers from the payment processor or financial institution, and an amount of money corresponding to the payment amount is remitted by the point-of-sale proprietor to the service provider.




(*E.g.*, https://support.ringcentral.com/article-v2/Change-billing-day-recurring-subscriptions.html?brand=RC_US&product=RingEX&language=en_US).



(*E.g.*, https://support.ringcentral.com/article-v2/Understanding-your-RingCentral-billing-account-overview-page.html?brand=RingCentral&product=RingEX&language=en_US).

**WHAT PERSONAL INFORMATION WE COLLECT**

***Personal Information you actively provide to us or we collect from third parties, business partners, other users, and service providers, or which is publicly available***

Your contact information/Identifiers: Name, username, email address, phone number, identity documents, IP address, and any other identifiers a user provides when accessing or using the Apps or Services.

Your payment information: Billing name, address, and credit card or other payment information.

Other information: Social media profiles, LinkedIn URLs, custom profiles and any other information about you that you may voluntarily provide or any information about you that may be publicly available.

(*E.g.*, https://www.ringcentral.com/legal/last-update-august-29-2025/privacy-notice.html).

13. **Statement Details:** The details of the charges incurred on your invoice within a billing period.

(*E.g.*, https://assets.ringcentral.com/us/guide/Invoice_Billing_UC_Guide_US.pdf).

13. **Statement Details**

14.

| Description | Start Date | End Date | Qty | Rate | Amount |
|---|---|---|---|---|---|
| **RingCentral** | | | | | |
| **Subscription - Charges** | | | | | |
| Office Standard - Subscription Fee | 10/30/2020 | 11/29/2020 | 1 | $0.00 | $0.00 |
| DigitalLine Unlimited Standard | 10/30/2020 | 11/29/2020 | 36 | $19.99 | $719.64 |
| **Subscription - Charges Subtotal** | | | | | **$719.64** |
| **Subscription - Taxes, Fees and Surcharges** | | | | | |
| Compliance and Administrative Cost Recovery Fee | 10/30/2020 | 11/29/2020 | 36 | $4.00 | $144.00 |
| e911 Service Fee | 10/30/2020 | 11/29/2020 | 36 | $1.00 | $36.00 |
| Federal - Universal Service Fund | | | | | $45.94 |
| State Taxes | | | | | $25.74 |
| **Subscription - Taxes, Fees and Surcharges Subtotal** | | | | | **$251.68** |
| **Subscription Subtotal** | | | | | **$971.32** |
| **RingCentral Subtotal** | | | | | **$971.32** |
| **RingCentral>Cost Center 2** | | | | | |
| **Subscription - Charges** | | | | | |
| DigitalLine Unlimited - new purchase Standard | 10/08/2020 | 10/29/2020 | 1 | $14.66 | $14.66 |
| DigitalLine Unlimited Standard | 10/30/2020 | 11/29/2020 | 8 | $19.99 | $159.92 |
| Additional Local Number | 10/30/2020 | 11/29/2020 | 11 | $4.99 | $54.89 |
| **Subscription - Charges Subtotal** | | | | | **$229.47** |
| **Subscription - Taxes, Fees and Surcharges** | | | | | |
| Compliance and Administrative Cost Recovery Fee - new purchase | 10/08/2020 | 10/29/2020 | 1 | $2.93 | $2.93 |
| e911 Service Fee - new purchase | 10/08/2020 | 10/29/2020 | 1 | $0.73 | $0.73 |
| Compliance and Administrative Cost Recovery Fee | 10/30/2020 | 11/29/2020 | 8 | $4.00 | $32.00 |
| e911 Service Fee | 10/30/2020 | 11/29/2020 | 8 | $1.00 | $8.00 |
| Federal - Universal Service Fund | | | | | $18.75 |
| State Taxes | | | | | $7.67 |
| **Subscription - Taxes, Fees and Surcharges Subtotal** | | | | | **$70.08** |
| **Subscription Subtotal** | | | | | **$299.55** |
| **Hardware - Charges** | | | | | |
| Polycom VVX-350 Business IP Phone - new purchase | | | 1 | $104.50 | $104.50 |
| Shipping and Handling Fees: US - Ground - new purchase | | | 1 | $13.20 | $13.20 |
| **Hardware - Charges Subtotal** | | | | | **$117.70** |
| **Hardware - Taxes, Fees and Surcharges** | | | | | |
| State Taxes | | | | | $6.27 |
| Local Taxes | | | | | $1.83 |
| **Hardware - Taxes, Fees and Surcharges Subtotal** | | | | | **$8.10** |
| **Hardware Subtotal** | | | | | **$125.80** |
| **RingCentral>Cost Center 2 Subtotal** | | | | | **$425.35** |
| **Total** | | | **Amount Due (Tax Included)** | | **$1,396.67** |

(*E.g.*, https://assets.ringcentral.com/us/guide/Invoice_Billing_UC_Guide_US.pdf).

10. **Cost Center:** If Cost Center Management has been enabled on your account, you have successfully created cost centers and allocated services accordingly. Cost Centers will reflect what was currently on your account. Any changes to your Cost Center Management will be applied moving forward and will reflect on your next invoice. Changes made will not be applied to past invoices.

11. **Payment Methods:** Ways to pay your RingCentral Invoice.
- Checks Regular Mail to Lock box
- Wire Instructions (USD)
- Courier Check Payment
- ACH Payment (USD)

12. **Billing Questions?** Instructions about how to contact RingCentral. Any questions outside of your invoice should be addressed your Sales Rep, Account Executive, or assigned CSM (Customer Success Manager).

10. **Summary by Cost Center**

| COST CENTER | AMOUNT |
|---|---|
| RingCentral | $971.32 |
| RingCentral>Cost Center 2 | $425.35 |
| Total | **$1,396.67** |

**Account Information**

**Customer User ID:** 11111111111
**Invoice No.:** INV_1111111
**Invoice Amount to Pay:** $1,396.67

11. **Payment Methods**

Please email remittance advice to **Collections@RingCentral.com**

**Checks Regular Mail to Lockbox:**
RingCentral Inc.
P.O. Box 734232
Dallas, TX 75373-4232

**Wire Instructions:**
JPMorgan Chase Bank For credit to: RingCentral Inc.
JPMorgan Chase New York, NY 10017
SWIFT ID: CHASUS33
ABA #: 021000021
Account #: 3602193095

**Overnight/Courier Check Payment:**
JPMorgan Chase (TX1-0029)
Attn: RingCentral Inc. 734232
14800 Frye Road, 2nd Floor
Ft Worth, TX 76155

**ACH Payment:**
JPMorgan Chase Bank For credit to: RingCentral Inc.
Account #: 3602193095
ABA #: 021000021

(*E.g.*, https://assets.ringcentral.com/us/guide/Invoice_Billing_UC_Guide_US.pdf).

52. Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such infringement of the '127 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

53. The asserted claim of the '127 Patent is a method claim to which the marking requirement is not applicable. Plaintiff has therefore complied with the marking statute.

## V. JURY DEMAND

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claim 1 of United States Patent No. 7,013,127 has been infringed directly and indirectly, either literally and/or under the doctrine of equivalents, by Defendant;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

d. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

November 3, 2026

Respectfully Submitted,

/s/ David A. Skeels
David A. Skeels
Texas State Bar No. 24041925
**Whitaker Chalk Swindle & Schwartz PLLC**
301 Commerce St., Suite 3500
Fort Worth, Texas 76102
817.878.0500 Telephone
817.878.0501 Facsimile
Email: DSkeels@whitakerchalk.com

*Attorneys for Plaintiff Pay As You Go, LLC*

Of Counsel:

David R. Bennett (IL Bar No.: 6244214)
(motion for *pro hac vice* to be filed)
Direction IP Law
P.O. Box 14184
Chicago, Illinois 60614-0184
Telephone: (312) 291-1667
dbennett@directionip.com